THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SUSIE BIGGER, on behalf of herself, individually, and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:17-cv-7753 |
| v. | ) ) | Judge Harry D. Leinenweber |
| FACEBOOK, INC., | ) ) | |
| Defendant. | ) ) | |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................ - 1 -

II. STATEMENT OF FACTS ............................................................................. - 1 -
   A. Facebook's Operations and Sales Organization ................................. - 1 -
   B. Plaintiff's Employment With Facebook .............................................. - 2 -
   C. Plaintiff's Primary Duties and Functions as a CSM for Facebook .................... - 3 -
      1. Facebook, Client and Industry Expertise ................................ - 4 -
      2. Solutions Selling / Recommendations ..................................... - 4 -
      3. Problem Solving and Troubleshooting .................................... - 7 -
      4. Data Insights and Measurement ............................................. - 8 -

III. ARGUMENT ................................................................................................. - 9 -
   A. STANDARD OF REVIEW ................................................................... - 10 -
   B. PLAINTIFF IS EXEMPT FROM THE FLSA AND IMWL .................... - 10 -
      1. The Applicable Exemptions ................................................... - 10 -
      2. Plaintiff Met the Salary Requirements of Both Exemptions ................ - 11 -
      3. The Highly Compensated Employee Exemption Clearly Applies to
         Plaintiff, Warranting Summary Judgment on her FLSA Claim ........... - 11 -
      4. Plaintiff Performed Administratively Exempt Duties at Facebook ...... - 12 -
         a. Plaintiff's Performed Office Work Directly Related to the
            Management or General Business Operations of Facebook. .... - 12 -
         b. Plaintiff Exercised of Discretion and Independent Judgment
            with Respect to Matters of Significance. ................................ - 17 -

IV. CONCLUSION ............................................................................................... - 20 -

LEGAL\39099602\1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................10

*Blanchar v. Standard Ins. Co.*,
736 F.3d 753 (7th Cir. 2013) ...........................................................................14, 18

*Carbaugh v. Unisoft Int'l, Inc.*,
CIV.A. H-10-0670, 2011 WL 5553724 (S.D. Tex. Nov. 15, 2011) .......................16

*Celotex v. Catrett*,
477 U.S. 317 (1986)................................................................................................10

*Cruz v. Lawson Software, Inc.*,
764 F. Supp. 2d 1050 (D. Minn. 2011)...................................................................15

*Encino Motorcars, LLC v. Navarro*,
138 S. Ct. 1134 (2018)............................................................................................11

*Haywood v. N. Am. Van Lines, Inc.*,
121 F.3d 1066 (7th Cir. 1997) *overruled on other grounds by Hill v.
Tangherlini*, 724 F.3d 965 (7th Cir. 2013)..............................................................13

*Piscione v. Ernst & Young, L.L.P.*,
171 F.3d 527 (7th Cir. 1999) *overruled on other grounds by Hill v.
Tangherlini*, 724 F.3d 965 (7th Cir. 2013)..............................................................13

*Sarver v. Experian Info. Sys.*,
390 F.3d 969 (7th Cir. 2004) ..................................................................................10

*Schaefer-LaRose v. Eli Lily & Co.*,
679 F.3d 560 (7th Cir. 2012) ...............................................................13, 14, 15, 19

*Verkuilen v. MediaBank, LLC*,
646 F.3d 979 (7th Cir. 2011) .......................................................................... *passim*

*Zelenika v. Commonwealth Edison Co.*,
09 C 2946, 2012 WL 3005375 (N.D. Ill. July 23, 2012)............................10, 11, 12

**Statutes**

29 U.S.C. § 213(a)(1)....................................................................................................10

FLSA............................................................................................................... *passim*

**Other Authorities**

29 C.F.R. § 541.200(a)..................................................................................................10

29 C.F.R. § 541.201......................................................................................................13

29 C.F.R. § 541.202(a)..............................................................................................17, 19

29 C.F.R. § 541.202(c)..............................................................................................17, 18

29 C.F.R. § 541.601(a)..................................................................................................11

29 C.F.R. § 541.601(c)..................................................................................................11

29 C.F.R. § 541.701......................................................................................................12

FED. R. CIV. P. 56(a)......................................................................................................10

LEGAL\39099602\1

## I.     INTRODUCTION

Despite that as a Client Solutions Manager ("CSM") at Facebook, Inc. ("Facebook") Plaintiff Susie Bigger ("Plaintiff") was a partner to her advertising clients and helped them navigate the exceedingly complex process of planning, implementing, monitoring, and optimizing advertising campaigns on Facebook's platforms, and despite the fact that she was paid handsomely in this crucial role - between $145,000 and $181,500 each year - she now claims that she was nothing more than an administrative assistant. However, her attempt to paint herself as a low-level functionary unable to make important decisions or exercise discretion in her job belies every shred of undisputed evidence available – most notably Plaintiff's own sworn testimony, her own self-reviews, performance reviews written by her managers and co-workers, Plaintiff's resume, her Performance Development Plan, and Facebook's clear expectations for her position as a CSM. Plaintiff's claims fail as matter of law, and summary judgment in Facebook's favor is warranted.

## II.     STATEMENT OF FACTS

### A.     Facebook's Operations and Sales Organization

Facebook is an electronic social media platform that enables users to connect, share, discover, and communicate with each other. SOF 5. Facebook generates revenue primarily from selling advertising placements displayed on its various electronic platforms, which its clients use to market their products, services, and/or ideas to users. SOF 5. Facebook offers those clients an impressive array of customization and monitoring options so that each client's message reaches people who are likely to be interested in the advertised goods, services, etc., which in turn drives revenue for the clients and for Facebook alike. SOF 5. The sales organization at Facebook has historically been organized around industries (known at Facebook as "verticals"), with sales teams, or "pods." SOF 6-7. Prior to 2014 these pods consisted of Client Partners, Account Managers, a

"people manager" and Media Solutions Managers ("MeSo"[1]) SOF 7. Pod members worked with internal "cross functional" partners ("XFNs") (e.g. measurement, marketing science, engineers, etc.) to create solutions that met the clients' specific objectives. SOF 7.

### B. Plaintiff's Employment With Facebook

Facebook hired Plaintiff in 2013 as an exempt Account Manager in the financial services "vertical." SOF 10, 14-15. In late 2013, Facebook combined the Account Manager position and the MeSo position into a new role entitled Client Solutions Manager ("CSM"), and Plaintiff assumed that new role. SOF 8, 16. Facebook's job expectations for CSMs, set forth in a Career Expectations Grid, are divided into six broad categories: (1) Solutions Selling and Functional Expertise, (2) Relationship Management and Account Operations, (3) Media and Measurement Strategy and Implementation, (4) Product Expertise and Data Insights, (5) Customer and Industry Knowledge, and (6) Leadership, Team Development, and XFN [Cross Functional] Collaboration. SOF 11. Plaintiff testified that each of the core responsibilities on the expectations grid involved a combination of what she referred to as "strategic" and "operational" duties. SOF 12. While Facebook expects that all CSMs will perform the same core duties, employees at higher pay grades (or "IC") levels[2] are expected to act with increasingly higher levels of independence, discretion, and autonomy. SOF 10. Although Plaintiff was classified as an IC4 throughout her employment at Facebook, she believes that she performed higher-level, IC5,[3] work. SOF 15, 80.

---

[1] MeSos performed analytical work - media planning and implementation of campaigns, optimizing those campaigns to see how they were performing, making recommendations, and analyzing data and extracting insight, all in an effort to advise clients on how to drive higher performance on the Facebook platform. SOF 7.

[2] Facebook places employees into various compensation bands, which it refers to as Individual Contributor ("IC") Levels. SOF 10. IC levels 1-2 are non-exempt, and IC levels 3 and above are overtime exempt. SOF 10.

[3] Plaintiff's Motion for Conditional Certification (Dkt 45) only seeks to certify a class of employees in IC3 and IC4 job classifications, tacitly conceding that IC5 was an exempt position. In other words, Plaintiff believes she was performing exempt duties.

Throughout her employment, Plaintiff was paid the same base pay every pay period and her pay did not vary based on the number of hours she worked. SOF 18. She never earned less than $106,000 in fixed salary while working at Facebook. SOF 18. From 2014 to 2016, Plaintiff earned between $146,000 and $183,000 in total compensation per year. SOF 18. In 2017 (the year Plaintiff was terminated) Plaintiff's base salary was $116,027.60, and prior to her termination she received commission of $14,265.76. SOF 18.

### C.       Plaintiff's Primary Duties and Functions as a CSM for Facebook

In Plaintiff's own words, her job was to "connect dots" between client's business objectives and Facebook's internal teams and their array of digital marketing product offerings. SOF 25, 39. She testified that she was the "glue" holding together the various parties involved - serving as liaison between the client, third party advertising agencies, and Facebook XFNs; reconciling information and communications among the parties; and then finding solutions to implement advertising campaigns. SOF 25-26, 41. Plaintiff was responsible for providing support, advice, and counsel to advertiser clients throughout the lifecycle of the advertising campaign; from pre-campaign planning and strategy, execution, measurement, and post-campaign analytics and optimization. *See* SOF 25 (CSM messaging throughout ad campaign), 31-35 (interfacing with client pre-campaign); 32, 38-47 (aligning needs with solutions and building the solution); 48-58 (implementing campaign and optimizing during and after); 59-67 (providing solutions at various points in the campaign) 68-79 (troubleshooting client problems during the campaign).

In an attempt to downplay the critical importance of her role as a CSM to Facebook's sales organization, Plaintiff contends that she spent 90-95% of her time on what she calls "operational" or "administrative" duties. SOF 24. However, as described in her deposition, the duties she claims

were "operational"[4] are fundamental to the very purpose of her job, i.e., promoting the sale of Facebook's panoply of digital marketing product offerings to advertisers. SOF 24. The overarching duties that comprise this role (and of which these purportedly "operational" tasks are a part) can be distilled as follows:

### 1. *Facebook, Client and Industry Expertise*

Not only did Plaintiff testify that it was her job as a CSM to maintain expertise on Facebook's slate of products, even as they rapidly evolved in a dynamic ecosystem, and how those may serve her clients' business needs and objectives, which in turn required that she possess deep knowledge about the clients' industry (insurance and banking industry knowledge) and each individual client's needs, but she acknowledged that she did so. SOF 25-30. To be sure, Plaintiff admitted that her role entailed sharing her knowledge (and the knowledge of her colleagues) with the client so they could make decisions based on her recommendations about whether the product met the client's business objectives. SOF 27-28. In fact, Plaintiff insisted that she did have in-depth product knowledge and did not "punt" on client questions. SOF 28. Given her industry, client, and internal expertise, Plaintiff was an integral conduit between the client and the teams that build the products and customized solutions for advertiser clients. SOF 27-55.

### 2. *Solutions Selling / Recommendations*

Plaintiff regularly met with clients in person, over the phone and/or via-teleconference,

---

[4] As further evidence of her attempt to downplay her role, Plaintiff lists duties such as inputting client information into Facebook's tools, obtaining Facebook promotional materials ("swag") for clients, scheduling and attending client meetings, liaising between the client and internal and external partners, using Facebook's tools as part of planning and executing measurement studies, revenue tracking in an effort to identify opportunities for earning incremental revenue, and troubleshooting. SOF 24. However, not only are these duties either entirely or largely exempt in the context of Plaintiff's client-facing solutions manager, product expert and educator, consultant, and campaign maximizer jobs, when asked how much time she actually spent on some of these tasks, she admitted that she spent 5 minutes a week scheduling internal meetings and 60 to 90 minutes a week scheduling and preparing for client meetings (most of which she herself either led or attended), 1 to 2 hours scheduling client entertainment (which only occurred 3 times a year), and 15-30 minutes a week ordering swag. SOF 24. Contrast this to her testimony that approximately 5 to 10 hours a week were spent meeting with clients. SOF 31.

sometimes for as long as six hours at a time, and on average five to ten hours per week. SOF 31. During these meetings Plaintiff listened to her clients explain the results or goals they wished to achieve through advertising campaign(s) on Facebook's platform. SOF 31. Plaintiff assessed those objectives and identified which of Facebook's products might help them achieve the desired results. SOF 31-32. Plaintiff made decisions about whether to engage other internal experts at Facebook and, if so, who to engage in order to determine what product could optimize the client's campaign on the platform. SOF 31-32, 38. Plaintiff would develop marketing plans both by engaging XFNs as well as doing some of her own "internal digging and sleuthing to find material." SOF 38-39. Plaintiff's self-reviews demonstrate, in her own words, that she regularly interacted with clients to assess and address their business needs:

– "We initiated multiple strategy sessions w/ [AGENCY][5] and [AGENCY] to get a better understanding of their goals/initiatives and then tied Facebook solutions to their objectives." SOF 34.

– "This was an incremental effort that took over 6 months to close. It took a village to pull everything off, required multiple in-person meeting, calls, emails and brainstorming sessions w/ the client, creative/media agencies and numerous internal huddles and syncs." SOF 34.

– "Relationships and Senior level meetings - we created much stronger relationships across key players at [CLIENT], [AGENCY], [AGENCY], [AGENCY] and [AGENCY] via weekly touch-points, meetings and calls… All of the above was accomplished by systematically attacking each 'pillar,' rigorous planning, follow-up on my part and leading numerous independent meetings, calls and presentations w/ [CLIENT], [AGENCY], [AGENCY], [AGENCY] and internal XFN partners." SOF 35.[6]

---

[5] Client names and Facebook pricing information constitute confidential information pursuant to Paragraphs 2(b) - (d) of the Agreed Confidentiality Order entered by this Court on June 5, 2018 (the "Protective Order") (Docket No. 21) and, thus, have been redacted from the public versions of Facebook's summary judgment ECF filings. Facebook is not seeking to file this information under seal because such information is not pertinent to the instant Motion, however, it is providing the Court and opposing counsel with unredacted courtesy copies of these filings.

[6] Despite these admissions, Plaintiff attempted in her deposition to downplay the importance of her role at these meetings and level of direct client interaction. Plaintiff initially claimed that her role at these meetings was purely administrative, in that she was required to schedule the meetings, coordinate meals, and bring Facebook promotional materials ("swag"). SOF 24, 36. However, when confronted about the purposes of these meetings, she readily admitted that she was, "taking notes while… participating" in those client meetings, listening to and recording her client's wants and needs, and that these notes were important to ensure alignment with the client an in building good client relationships. SOF 37. She conceded that her involvement and note taking in these meetings was both strategic and operational in nature. SOF 37.

- 5 -

– "I made it my mission to educate and inform [the client] on the Facebook/Instagram platform and our measurement solutions." SOF 76.

Once Plaintiff identified the appropriate product offerings, she would create a recommendation for the client. SOF 43.

Sometimes clients would communicate a particular need or business objective that could not be met by existing Facebook product offerings. SOF 42. Plaintiff specifically testified that in those instances, it was her responsibility to interface with the client to obtain more information about the way in which what they were requesting would help drive their business, or why it would help them spend more money with Facebook. SOF 42. Plaintiff would then relay that information back to the internal cross functional partners, such as the engineering team, to find out if there was an opportunity to create a new product. SOF 42. Once it was determined that a product could be built to help the client achieve their objective, Plaintiff "work[ed] with engineers... [and] other internal partners to figure out how to build that product." SOF 43. After coordinating with Facebook's cross functional partners to determine whether and how a solution could be built, Plaintiff packaged that information into a recommendation for the client. SOF 43. In that respect, Plaintiff aligned client objectives to Facebook solutions (which was a core responsibility outlined in the CSM Career Expectations Grid). SOF 32, 39.

Again, Plaintiff's self-reviews are illuminating in that they show her intimate involvement in creating client solutions that resulted in tangible revenue streams for Facebook:

– "We uncovered a new Video team w/in [AGENCY] and proactively pitched our TRP product. It took several months to plan, and when we finally received verbal approval, we learned that [CLIENT] needed the campaign to be flighted identically w/ their weekly Broadcast buying schedule, but we could not flight the campaign this way due to limitations … I was ultimately able get the client to be more comfortable w/ updating the flighting and provided reporting that was aligned w/ their internal system/KPIs. Had I not been able to come up w/ a solution, we would have lost $[REDACTED] K." SOF 44.

- "I executed and launched several large, complex and never-been done before campaigns for [CLIENT] and [CLIENT]. This required coming up w/ creative workarounds, 1:1 communication w/ clients/agencies after-hours, over the holidays and during weekends. I navigated and solved complex measurement issues with Eng, research and Nielsen, solved technological errors, had to make last minute tweaks to measurement plans and campaign strategy, escalated product bugs, worked w/ policy teams to approve creative, collaborated with GSS and multiple XFN partners. All of these efforts led to flawless executions, positive measurement outcomes and satisfied clients." SOF 45.

Another significant part of Plaintiff's role was "upselling," meaning that, through analysis of campaign performance data, she determined where there were opportunities, or "gaps" for clients to improve campaign performance and increase the revenue they can realize through the use of Facebook's advertising platform. SOF 49-50. Plaintiff believed that, as a CSM, she independently uncovered opportunities that will improve performance. SOF 52. Plaintiff recommended different types of Facebook product offerings where the client could allocate their advertising dollar. SOF 48-52. This drove revenue for Facebook as well as for the client. SOF 50.

### 3. Problem Solving and Troubleshooting

Another aspect of Plaintiff's job was helping to resolve clients' operational issues, which Plaintiff refers to as "bug fixes" or "troubleshooting." SOF 68-79. By way of just one example, a client may flag issues with how a particular ad is loading. Plaintiff's job was to help troubleshoot a solution. SOF 70. Plaintiff, who was not a help-desk technician or engineer, would first consult guidelines for bug fixes, but often she was unable to fix the issue independently and would thus engage the appropriate partner at Facebook to devise a fix. SOF 69. Doing that required Plaintiff to digest the information from the client about the issue, identify the correct internal XFN partner to resolve the issue, and engage with that team(s) to identify a solution. SOF 68-70. All of this troubleshooting was designed to ensure that the client was happy with the campaign execution, which in turn would drive revenue. SOF 70.

As reflected in Plaintiff's self-reviews, troubleshooting was a key component of her client relationship-building, client education and client satisfaction duties:

–   "In Q1 14 all campaigns running out of [AGENCY] were canceled due to [AGENCY] account transition. There was a tremendous learning curve for [AGENCY], which meant that we were in contact w/ the team daily helping to set up campaigns, troubleshoot issues and answer questions." SOF 73.

–   "In H2, [CLIENT] experienced numerous issues w/ PE, specifically issues w/ uploading accounts that have 10K ads. These issues were holding up campaign launches, optimizations and incremental efforts. I spent a considerable amount of time troubleshooting w/ the client, working w/ Social.com, documenting business cases and logging tasks. I was able to build a case w /Eng, connected w/ other pods and discover that other advertisers were experiencing similar issues. Eventually Eng escalated to a UBN and the issue was solved." SOF 74.

In her own words, "troubleshooting" meant that Plaintiff acted as "a conduit between clients and engineering teams at Facebook" and a "liaison between the client and many other teams at Facebook…" SOF 68. "Troubleshooting" required Plaintiff to investigate and understand the client's problem, use Facebook's internal troubleshooting literature, and engage Facebook's resources internally in an effort to help her and the client resolve the problem. SOF 69.

### 4. Data Insights and Measurement

Plaintiff continued to run point while a particular advertising campaign was running.  For instance, during the course of a campaign Plaintiff was expected to independently produce client-ready reports. SOF 26. Plaintiff insisted that she did this.  SOF 26.  Indeed, both during a campaign and after it had ended, Plaintiff was responsible for analyzing its performance and crafting insights for her clients, all for the purpose of optimizing the clients' campaign performance on the Facebook platform and uncovering opportunities to improve their return on investment.  SOF 49-67. Clients would communicate certain metrics that they were interested in, for instance a certain number of clicks they were looking to achieve. SOF 49.  Plaintiff would look at whether the campaign was achieving those targets and make recommendations as to where to move their budget in order to optimize the campaign. SOF 49-50.

Plaintiff also generated insights by inputting data into Facebook tools in order to generate reports and information about clients' campaign performance and to measure "lift"[7]. SOF 53-54, 59-64. Specifically with respect to lift, Plaintiff was required to create lift "studies" based on her client's objectives to accurately measure the efficacy of the campaign. SOF 59-67. While Plaintiff also characterized aspects of this work as "operational," she also admitted that it was her responsibility to create the parameters of the lift study based on information she received from her clients and in conjunction with internal measurement specialists at Facebook, extract complex data sets, interpret the data and convey the results to the client in order to offer new or improved advertising solutions. SOF 59-67. This required Plaintiff to liaise between Facebook marketing sciences team and the client in order to achieve the best possible results for that client. SOF 59-64.

Indeed, Facebook expected Plaintiff to analyze myriad reports extracted from various tools to measure how a particular campaign was performing with respect to key metrics identified by her clients, and to provide insight to the client about what the data means for the client's advertising strategy, how the ad is performing in comparison to competitor's ads (i.e. benchmarking), and in certain circumstances an optimization recommendation. SOF 48-67. Plaintiff conceded that she applied her pre-existing knowledge of prior campaigns to insights and relayed those to clients. SOF 54. Plaintiff even noted her measurement achievements in a self-review:

> I created a measurement framework and learning agenda, …[CLIENT] is currently running Nielsen BE, DAR and TAR alongside the 1st phase of the Re-brand and is planning to launch a three cell bidding/targeting lift study in Q3. These learnings will ultimately set them up for success for 2017.

SOF 66.

### III. ARGUMENT

---

[7] "Lift" is a way to measure the efficacy of a particular campaign. SOF 59. Facebook's measurement lift tool tells Plaintiff and the client how likely people who were exposed to a particular ad were to take action in response to the ad (e.g., apply for a credit card) – also known as "conversion." SOF 59.

Plaintiff alleges she was improperly categorized as exempt from the Fair Labor Standard Act's ("FLSA") and Illinois Minimum Wage Law's ("IMWL") overtime requirements. However, the undisputed evidence establishes that Facebook properly classified Plaintiff as exempt from overtime requires under the "highly compensated employee" and "administrative employee" exemptions, and therefore summary judgment is warranted.

### A.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party satisfies its burden, the non-movant must present facts to show a genuine dispute exists to avoid summary judgment, which requires that she "do more than show that there is some metaphysical doubt as the material facts." *See Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *Sarver v. Experian Info. Sys.*, 390 F.3d 969, 970 (7th Cir. 2004).

### B.  PLAINTIFF IS EXEMPT FROM THE FLSA AND IMWL

#### 1.  The Applicable Exemptions

Under the FLSA and IMWL, Facebook is not required to pay overtime compensation if Plaintiff was "employed in a *bona fide* … administrative … capacity." 29 U.S.C. § 213(a)(1). To prove that the exemption applies, Facebook must establish that: (1) Plaintiff was compensated on a salary or fee basis at a rate of not less than $455 per week; (2) her primary duty was the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) her primary duty included the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a); *see also Zelenika v. Commonwealth Edison Co.*, 09 C 2946, 2012 WL 3005375, at *14 (N.D. Ill. July 23, 2012)(emphasis in original)(quoting 820 ILCS 105/4a(2)(E)) ("The IMWL

applies the administrative and executive exemptions 'as defined by or covered by' the FLSA").[8]
The Supreme Court recently held that exemptions to the FLSA should be given a fair (rather than
a narrow) interpretation. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

The FLSA provides a more streamlined test for "highly compensated employees" under which
the **"high level of compensation is a strong indicator of an employee's exempt status**, thus
eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c)
(emphasis added). Plaintiff is thereby exempt if her total annual compensation is at least $100,000
and she "customarily and regularly performs any one or more of the exempt duties or
responsibilities of an … administrative … employee …" 29 C.F.R. § 541.601(a).

### 2. Plaintiff Met the Salary Requirements of Both Exemptions

There is no dispute that Plaintiff meets the first prong of both exemptions. She was
compensated on a salary basis (i.e., a predetermined salary amount in each pay period) at a rate
that far exceeds $455 per week. SOF 18. Plaintiff's annual compensation ranged between $130,000
and $183,000 in each year that she was employed at Facebook. SOF 18. There is also no dispute
that Plaintiff's work was non-manual, office work. SOF 19.

### 3. The Highly Compensated Employee Exemption Clearly Applies to Plaintiff, Warranting Summary Judgment on her FLSA Claim

Plaintiff is clearly exempt under the FLSA pursuant to the more relaxed Highly Compensated
Exemption (HCE) analysis. To qualify for the HCE Facebook must prove that Plaintiff (1) was
paid more than $100,000 per year (and there is no dispute over that – SOF 18); and (2) that Plaintiff
either customarily and regularly performed at least one administratively exempt duty; *or* that she

---

[8] Employees compensated on a salary or fee basis at a rate of not less than $250 per week, or $13,000 per year, are subject to the "short test", which mirrors the general test in the present regulations: employers had to establish compensation on a salaried basis, primary duties of non-manual work related to management or general business operations, *and* primary duties involving the exercise of discretion and independent judgment. *Zelenika*, 09 C 2946, 2012 WL 3005375 at *14 (citing 29 C .F.R. § 541.214 (2003)).

customarily and regularly exercised discretion in her performance of her duties. *See Zelenika*, 2012 WL 3005375, at \*12. "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

Plaintiff was not a production employee who occasionally performed an administratively exempt duty. While Plaintiff claims she spent 80-95% of her time on what she calls "operational," non-exempt tasks, in light of prevailing law as discussed herein, a plain reading of her testimony shows that those task are either independently exempt, or are part and parcel of her exempt duties. SOF 24, 36-37, 41, 48, 51 63, 68. Indeed, Plaintiff held a multi-faceted advisory/consultative role to Facebook's clients designed to promote the sale of Facebook's suite of advertising products in a dynamic and rapidly evolving digital marketing environment. As elaborated upon in great detail above, and further in Section B(4)(a)-(b) below, Plaintiff not only customarily and regularly performed administratively exempt duties such as advising/consulting with Facebook's clients, and promoting the sale of Facebook's products, such duties were the very purpose of her job. Plaintiff did not perform these types of duties once or twice, these duties took up 80-90% of her time. This means that, at a minimum, she meets the lower threshold for the HCE, warranting summary judgment in Facebook's favor on Plaintiff's FLSA claim. *See Zelenika,* 2012 WL 3005375, at \* 13 (granting summary judgment on FLSA claim brought by dispatchers whose duties included monitoring and responding to problems).

### 4. Plaintiff Performed Administratively Exempt Duties at Facebook
#### a. Plaintiff's Performed Office Work Directly Related to the Management or General Business Operations of Facebook.

The FLSA regulations provide that "advertising," "marketing" and advising/consulting work is "directly related to the management or general business operations of the employer" or its

- 12 -

customers. 29 C.F.R. § 541.201. Further, the administrative operations of the business include work "promoting sales," which is an exempt duty. *Schaefer-LaRose v. Eli Lily & Co.*, 679 F.3d 560, 574-76 (7th Cir. 2012) (citing 69 Fed. Reg. at 22,138 (Apr. 23, 2004)); *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066 (7th Cir. 1997) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

Plaintiff's primary job duty[9] as a CSM was to promote the sale of Facebook's suite of advertising products through consultation[10] with its clients and partnership with internal experts. SOF 25-79. As an IC4 she was expected to perform these functions with a significant amount of autonomy and independence. SOF 10. Plaintiff served as a point person for Facebook's clients and the expert on Facebook's products and solutions. SOF 27-30. Plaintiff was expected to leverage her industry and client knowledge to understand how those clients could use those products to grow their business. SOF 27-30. Plaintiff advised and coordinated with Facebook clients regarding the various product offerings, all in an effort to help those clients maximize their advertising spend on Facebook, thus encouraging them to invest more advertising dollars in the platform (or prevent a loss of revenue). *See, e.g.,* SOF 26 (advice and consulting serves to increase revenue), 33 (meeting with clients serves to generate revenue), 38-42 (devising client solutions serves to

---

[9] "An 'employee's primary duty is that which is of principal importance to the employer, rather than collateral tasks which may take up more than fifty percent of his or her time.'" *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 541 (7th Cir. 1999) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)(quoting *Reich v. State of Wyo.*, 993 F.2d 739, 742 (10th Cir. 1993).

[10] Plaintiff concedes that she gave clients advice and recommendations about their advertising spend on Facebook, but denies that makes her a "consultant." SOF 26, 28, 31, 43, 50-52, 61. Merriam Webster defines "consulting" as "providing professional or expert advice," which is precisely what Plaintiff did as a CSM. *See, e.g.,* SOF 26, 28, 31, 43, 48, 50-52, 61 (each discussing Plaintiff's role in advising clients); Miriam-Webster Online Dictionary (https://www.merriam-webster.com/dictionary/consulting). In other words, Plaintiff is playing a semantic game in an effort to avoid summary judgment. In fact, Plaintiff did this repeatedly throughout her deposition, consistently claiming she did not have discretion, or in the way that she defined "operational" and "strategic" (presumably in an effort to downplay her high-level and complex duties) *See* SOF 24, 36, 37, 41, 48, 51, 63, 68 (instances of Plaintiff characterizing her work as "operational".) However, Plaintiff does not get to decide what duties are exempt or non-exempt. As described in detail herein, the work she testified in her deposition that she performed for Facebook constitutes exempt work under the law, warranting summary judgment in Facebook's favor.

generate revenue), 50 (campaign optimization and upselling promote revenue), 70 (troubleshooting problems with existing campaigns prevents a loss of committed revenue). In this regard, Plaintiff's job duties, even those she dubbed "operational," were performed for purposes of marketing and promoting the sale of Facebook's advertising platform to these clients. As such, her duties are "directly related to the management or general business operations" which, in the context of the administrative exemption," means that she performed work "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *See Schaefer-LaRose*, 679 F.3d at 573.

Courts that have examined similar duties to the ones Plaintiff described in her deposition have consistently found this type of work is administratively exempt. The Seventh Circuit has repeatedly held that account manager duties designed to promote sales, similar to Plaintiff's, are directly related to assisting with the running or servicing of the business (as opposed to production work). *See, e.g., Schaefer-LaRose*, 679 F.3d at 574 (employees whose work is to support and promote sales generally will satisfy the "directly related" prong); *Blanchar v. Standard Ins. Co.*, 736 F.3d 753, 757 (7th Cir. 2013)("…since the marketing representatives' duties were 'aimed at promoting ... customer sales generally,' their duties were directly related to the management and general business operations of the company."); *Verkuilen v. MediaBank, LLC,* 646 F.3d 979 (7th Cir. 2011) (account manager performed duties that were directly related to general business operations both of employer and of employer's advertising agency clients where employee acted as intermediary between clients and company's software developers).

Plaintiff's job duties as she herself described them in her deposition are strikingly similar to the duties of the Plaintiff in *Verkuilen v. Mediabank, LLC*, whom the Seventh Circuit observed

- 14 -

was "a picture perfect example of a worker for whom the [FLSA's] overtime provision is ***not*** intended." 646 F.3d 979, 981 (7th Cir. 2011) (emphasis added). The *Verkuilen* plaintiff worked as an account manager by the defendant, a software company that provided computer software to advertising agencies. *Id*. There, Verkuilen "acted as a bridge between the software developers and the customers, helping to determine the customers' needs, then relaying those needs to the developers and so assisting the customization of the software, and finally helping customers use the customized software." *Id*. After the *Verkuilen* court noted the complexity of the media buying business, and the attendant complexity of the defendant's software, it went on to find that, "[t]he complexity and variance are where the account manager comes in. The manager of a customer's account has to learn about the customer's business and help [defendant's] software engineers determine how its software can be adapted to the customer's needs." *Id*. at 982. The court then made the following observation, which is precisely on point:

> The account manager is not a salesman for Best Buy or a technician sitting at a phone bank fielding random calls from her employer's customers … she's … the intermediary between … advertising agencies struggling to master complex software and the software developers at MediaBank … Identifying customers' needs, translating them into specifications to be implemented by the developers, assisting the customers in implementing the solutions … account managers are expected to go out, understand [the customers' requirements], build specifications, understand the competency level of our customers. Then they will build functional and technical specifications and turn it over to ... developers who will then build the software, ... checking in with the account manager, making sure what they are building is ultimately what the customer wanted.

*Id*. at 982. The court concluded, "plaintiff's primary duty was directly related to the general business operations both of her employer and (as in a consulting role) of the employer's customers." *Id.*[11]

---

[11] *See also Schaefer-LaRose*, 679 F.3d at 576-77 (pharmaceutical marketing representatives who served as the "face" of their employer and were the main conduit by which customers could provide meaningful feedback to the employer were engaged in work that constituted "running or servicing" the business); *See also Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1066 (D. Minn. 2011) ("Plaintiffs are closer to problem solvers who might recommend that the

- 15 -

Here, just as in *Verkuilen*, Plaintiff admittedly served as a point person and product expert for Facebook's clients at every stage of their campaigns in an ever evolving social media/digital advertising environment. SOF 27-79. Plaintiff was a trusted advisor to Facebook's clients, tasked with learning her clients' business and gaining an intimate understanding of their advertising goals. *See* SOF 25-37. She worked alongside the client to identify and understand their objectives, digesting that information and deciding which of Facebook's cross functional partners to engage in order to meet those objectives. SOF 31-47. Plaintiff was a conduit and liaison between clients and the XFN teams within Facebook who contribute to various aspects of the campaign. SOF 38-47, 68. Plaintiff testified that she was the "glue" between these teams and the client; her job was to collaborate with those partners to develop and ultimately implement solutions, all the while educating the client about how the solution can help them meet their goals. SOF 25-58; 68-77.

Regardless of Plaintiff's attempt to downplay her role through subjective description of her duties as "operational," and not "strategic" (terms that are not meaningful in the lexicon of legal analysis when it comes to FLSA and IMWL exemptions), Plaintiff's role was critical to driving Facebook's revenue and promoting the sales of both Facebook's clients' products as well as client investment in access to Facebook's platform. SOF 26 (advice and consulting serves to increase revenue), 33 (meeting with clients serves to generate revenue), 38-42 (devising client solutions serves to generate revenue), 50 (campaign optimization and upselling promote revenue), 70 (troubleshooting problems with existing campaigns prevents a loss of committed revenue).

As such, there is no genuine dispute that Plaintiff's job duties satisfy the "directly related"

---

client change certain business practices in order to work effectively with the new software, and participate in the design of client configurations, than to the IT workers who work to maintain a computer system or who perform routine installations."); *Carbaugh v. Unisoft Int'l, Inc.*, CIV.A. H-10-0670, 2011 WL 5553724, at *22 (S.D. Tex. Nov. 15, 2011)(finding exempt software consultant who, "[a]s the intermediary between the employees of the customers who needed to master his employer's complex software and the software developers, he had to identify the customers' needs, translate them into specifications to be implemented, and assist in the implementation.").

prong of the administrative employee exemption. That alone renders her exempt from overtime under the FLSA's Highly Compensated Exemption and entitles Facebook to Summary Judgment on its Second Affirmative Defense.

### b. Plaintiff Exercised of Discretion and Independent Judgment with Respect to Matters of Significance.

The undisputed facts easily establish the third and final prong of the administrative exemption, i.e., that Plaintiff, who served as the primary contact, product expert and trusted advisor for Facebook's advertising clients, exercised discretion and independent judgment with respect to matters of significance. Again, Plaintiff downplayed her discretion in her deposition, repeatedly describing duties but adding, as an aside, that she did not exercise discretion in those duties or that she did not perform those functions independently.[12] As elaborated upon herein, however, Plaintiff's disclaimers of discretion or independence belie the substance of her testimony and other written statements, as well as Facebook's well-established expectations of a CSM at her level.

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered" 29 C.F.R. § 541.202(a). This "implies that the employee has authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). However, it "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for

---

[12] In several instances throughout her deposition Plaintiff volunteered that she did not think she had "discretion". (Bigger Dep. 126:10-19 (generally denying discretion related to tasks that "were already written down"); 144:19-145:20 (denying discretion in serving as liaison between client and internal teams working to diagnose and fix bugs); 181:7-182:6 (denying discretion in "having to connect dots between" the advertiser and Facebook's product team and denying discretion make decisions on behalf of her customers) 196:10-197:1 (denying discretion to unilaterally create new products) 275:1-19 (denying discretion to decide for the client what targets or details to use in a marketing study)).

action rather than the actual taking of action." *Id.*; *see also Blanchar*, 736 F.3d at 758 (duties in promoting sales, advising sales staff, and fielding questions required the exercise of "a great deal of discretion and independent judgment" even though he lacked final-decisionmaking authority).[13]

In determining whether this prong of the analysis has been satisfied, particularly in the marketing or account manager context, courts will consider:

> [T]he employee's freedom from direct supervision, personnel responsibilities, troubleshooting or problem-solving activities on behalf of management, use of personalized communication techniques ... responsibility for assessing customer needs, primary contact to public or customers on behalf of the employer, the duty to anticipate competitive products or services and distinguish them from competitor's products or services, advertising or promotion work, and coordination of departments, requirements, or other activities for or on behalf of employer or employer's clients or customers.

*Blanchar*, 736 F.3d at 758.

Here, Plaintiff admittedly made recommendations to Facebook's clients about how to best allocate their advertising dollars on the platform. SOF 49-67. She was responsible for troubleshooting client issues and devising solutions for clients' advertising problems. SOF 68-79. She was the point person to Facebook's clients, and was expected to assess their needs and identify which XFN partners within the Facebook organization could best resolve whatever issues arose. SOF 31-37, 68-79. She would also have to decide what information to relay back and forth between the client and these cross functional partners. SOF 39-41. In other words, Plaintiff helped to devise "solutions," which required her to work with the client to identify issues, and then either independently working through Facebook's troubleshooting resources or, alternatively, interfacing

---

[13] Insofar as Plaintiff argues that she did not have discretion because she sought approval prior to making recommendations, that claim misses the mark. Even accepting the position that she sought approval to make recommendations from others at Facebook, that does not mean she did not exercise discretion and independent judgment in the performance of her duties. Apart from the fact that such an argument is legally flawed in light of the regulations and established Seventh Circuit case law, her theory is factually defective because Plaintiff was not required (nor encouraged) to obtain approval to make a recommendation. Quite the opposite, Plaintiff acknowledged she was *expected* to and did devise solutions and recommendations independently. SOF 26, 52, 65. Thus, the fact that she may have sought approval on her own volition is of no moment.

between the client and Facebook's engineers to develop a solution to the client's problem. SOF 68-79. Plaintiff testified that she frequently met with clients to discuss their business objectives and communicate recommendations (verbally and through visual presentations) to the client as to how they can achieve those objectives using Facebook's platform. SOF 31-37; 49-50. Plaintiff was a substantial contributor, often the driving force, in creating the finished product that was ultimately communicated to the client. SOF 31-58 (campaign planning and execution); 59-67 (measurement and insights). Plaintiff testified repeatedly that she, after considering the available options, either independently or in concert with others on her team, made recommendations to clients based on these problem-solving efforts. SOF 26, 28, 31, 43, 50-52, 61.

These descriptions exemplify, by the common and legal definitions of the word, what discretion and judgment are.[14] 29 C.F.R. § 541.202(a). It comes as no surprise that these activities are precisely the "problem solving" that courts deem to satisfy the third administrative exemption prong. *See e.g.*, *Verkuilen*, 2010 WL 3003860, at *2 ("when confronted with a client's problem in using [the] software, Verkuilen determined the nature of the problem and how to handle it."); *Schaefer-LaRose*, 679 F.3d at 582 (although pharmaceutical sales representatives were required to deliver their employer's messages with precision, core function of their duties required them to tailor their messages to respond to changing circumstances); *see also Verkuilen*, 646 F.3d at 982 (holding that an account manager at a software company who "[i]dentif[ied] customers' needs, translat[ed] them into specifications to be implemented by the developers, [and] assist[ed] the customers in implementing the solutions" qualified for the administrative exemption).

Finally, it is obvious that each of the foregoing duties were of critical importance to Facebook

---

[14] Critically, despite her repeated claims that she did not have discretion, Plaintiff testified she believed she was performing at an IC5 level, a classification which imposes an even higher obligation upon incumbents to operate autonomously and exercise sound judgment than upon employees in Plaintiff's IC4 position. SOF 80.

and its economic success. The better Plaintiff analyzed campaign performance data, troubleshooting issues/offering solutions, extracted insights, and translated insights into actionable recommendations and optimization strategies to help her clients realize more return on their investment, the more her clients were incentivized to invest even more of their advertising dollars in Facebook. It goes without saying that these activities drove revenue for Facebook. Thus, Plaintiff not only exercised discretion, but did so with respect to "matters of significance." *See Verkuilen*, 2010 WL 3003860, at *3 (employee who was the primary customer contact for important company clients and helped to resolve problems those clients had using the company's software was found to have exercised discretion with respect to matters of significance.) This alone means that Plaintiff was exempt under the FLSA's Highly Compensated exemption and entitles Facebook to Summary Judgment on its Second Affirmative Defense. In conjunction with the fact that Plaintiff's job duties satisfy the "directly related" prong of the administrative employee exemption, she is also exempt under the Administrative Exemption of the FLSA and, in turn, the IMWL, which entitles Facebook to Summary Judgment on its Third Affirmative Defense.

## IV. CONCLUSION

There is no genuine dispute of fact that Plaintiff's job duties at Facebook fall squarely into the highly compensated employee exemption to the FLSA and administrative employee exemption to the FLSA and IMWL. Based on the available evidence, and pursuant to the law discussed herein, this Court should grant summary judgment on Facebook's Second (FLSA exemption) and Third (IMWL exemption) Affirmative Defenses.

Dated: November 15, 2018

By:    */s/ Anneliese Wermuth*

Jason E. Barsanti
Anneliese Wermuth
Jenny R. Goltz
**COZEN O'CONNOR**
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 474-7900
(312) 474-7898
jbarsanti@cozen.com
awermuth@cozen.com
jgoltz@cozen.com
***Counsel for Defendant Facebook, Inc.***

- 21 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing *Defendant Facebook, Inc.'s Memorandum of Law in Support of Defendant's Motion for Summary Judgment* was electronically filed with the Clerk of Court using the CM/ECF system and served upon the attorneys shown below by transmittal of a Notice of Electronic Filing on November 15, 2018:

> Ryan F. Stephan
> James B. Zouras
> Teresa M. Becvar
> STEPHAN ZOURAS, LLP
> 100 N. Riverside Plaza, Suite 2150
> Chicago, IL 60606
> rstephan@stephanzouras.com
> jzouras@stephanzouras.com
> tbecvar@stephanzouras.com

> /s/*Anneliese Wermuth*
> Anneliese Wermuth