IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SUSIE BIGGER, individually
and on behalf of those
similarly situated,

       Plaintiff,

   v.

FACEBOOK, INC.,

       Defendant.

Case No. 17 C 7753

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

This case concerns the Client Solutions Manager ("CSM") position at Facebook, Inc., and whether that role constitutes an "overtime-exempt" position under the Fair Labor Standards Act ("FLSA") and Illinois Minimum Wage Law ("IMWL"). For the reasons stated herein, Defendant's Motion for Summary Judgment (Dkt. No. 48) is denied. Plaintiff's Motion for Conditional Certification of an FLSA collective action (Dkt. No. 45) is granted in part and denied in part.

## I. BACKGROUND

Defendant Facebook, Inc. ("Facebook") is a social media company. It generates revenue primarily from selling advertisements that are displayed on its various electronic platforms. (Def.'s Statement of Facts ("SOF") ¶ 5, Dkt. No. 57.)

Facebook offers its clients an array of customization and monitoring options so that each client can precisely target particular demographics in its advertisements. (*Id.*) Facebook employs an array of advertising, marketing, and engineering professionals to shepherd clients through the process of implementing a Facebook advertising campaign. (SOF ¶ 6.) Facebook's sales structure is organized around industries (known at Facebook as "verticals") and sales teams (known as "pods"). (SOF ¶ 7.)

Facebook utilizes a compensation system in which employees are hired at certain designations that indicate their role and compensation level. For example, a manager in human resources might be designated "M-2": "M" for manager and "2" for second level. (Hickman Dep. 40:8-17, Ex. A to Pl.'s Statement of Additional Facts ("SOAF"), Dkt. No. 58-1.) This case concerns the "Individual Contributor" ("IC") (*i.e.*, non-managerial) designation. (SOF ¶ 10.) An IC-1 is an Individual Contributor level 1, an IC-2 is an Individual Contributor level 2, and so on. (*Id.*)

This case concerns a particular position at Facebook — the Client Solutions Manager ("CSM") — whose origin lies in two prior roles that Facebook has since eliminated. Prior to 2014, a sales "pod" included, among other positions, an Account Manager and a Media Solutions Manager ("MeSo"). (SOF ¶ 7.) Account Managers had

a "sales role" in which they were responsible for "upselling" Facebook products. (Hickman Dep. 43:3-22.) "Upselling" is a sales technique in which a seller encourages the customer to purchase additional items or upgrades to make a more profitable sale. (*Id.*) Parties disagree over how exactly to characterize the MeSo role, and the extent to which MeSos were overtime exempt. Facebook contends that MeSos had a sales role as well as "more analytical" duties that included planning, implementing, and optimizing the performance of advertising campaigns. (*Id.* at 41:20-43:22.) In contrast, Plaintiff claims that MeSos performed operational duties, including data entry, troubleshooting bugs in ads, and following up with clients on unpaid invoices. (Bigger Dep. 141:16-149:21.) Plaintiff claims that Facebook classified all MeSos as overtime exempt (Bigger Dep. 131:16-132:3); Facebook contends that only MeSos at certain IC levels were exempt. (Hickman Dep. 36:21-24.)

Facebook hired Plaintiff Susie Bigger ("Bigger") in April 2013 to work in its Chicago office as an Account Manager in the Financial Services "vertical" (industry team). (SOF ¶ 14; Bigger Dep. 74:1-5.) Bigger received an IC-4 designation, which rendered her exempt from overtime compensation. (SOF ¶ 15.)

In late 2013, the Account Manager and MeSo positions were merged into a new role called Client Solutions Manager ("CSM").

(SOF ¶ 8.) Bigger was one of many who assumed that position. (SOF ¶ 16.) Some CSMs were classified as exempt and some as nonexempt. (SOF ¶ 10.) CSMs at IC-1 and IC-2 are non-exempt, overtime eligible positions, and CSMs at IC-3 and above are overtime exempt. (*Id.*) Facebook employees at higher IC levels are expected to act with increasingly higher levels of independence, discretion, and autonomy. (SOF ¶ 10.) However, the "core job responsibilities" of a CSM are "the same" across all IC levels. (Hickman Dep. 61:22-25.) Regardless of office location, all CSMs are employed full-time and have the same compensation structure, which is approximately 75% base salary plus 25% commission based on sales quotas. (Hickman Dep. 51:20-25, 87:19-25.)

Bigger retained her IC-4 designation when she became a CSM. (SOF ¶ 15.) Plaintiff claims she worked an average of 60 hours per week as a CSM. (Bigger Dep. 336:5-7.) Due to her IC-4 designation, Facebook classified her as exempt and did not pay her overtime. (*Id.*)

Plaintiff filed suit against Facebook on October 27, 2017, on behalf of herself and other similarly situated CSMs. Plaintiff claims that Facebook wrongly classified her, and all other IC-3 and IC-4 CSMs, as overtime exempt. She brings two counts: (1) a putative 29 U.S.C. § 216(b) collective action for violating the FLSA's overtime provisions, and (2) a putative Federal Rule of

- 4 -

Civil Procedure 23 class action for violating the IMWL's overtime provisions. Plaintiff defines her putative FLSA collective as follows:

> All individuals who were employed by Facebook as Client Solutions Managers at level IC-3 or IC-4 at any location in the United States during the period from three years prior to the entry of the conditional certification order, and as extended by stipulation of the parties, to the present.

Bigger now moves for conditional certification of her proposed FLSA collective. Facebook moves for summary judgment, contending that it cannot be held liable under the FLSA and IMWL as a matter of law. The Court will begin with its analysis of Facebook's summary judgment motion.

## II. **SUMMARY JUDGMENT**

### A. Incomplete Discovery

As a preliminary matter, Plaintiff contends that Facebook's summary judgment motion is premature. The parties originally planned to conduct discovery in two phases, with one phase to precede and another to follow Plaintiff's Motion for Conditional Certification, as is customary in FLSA collective actions. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9, Dkt. No. 56; Decl. of Teresa Becvar, Ex. A to Pl.'s Resp. to Def.'s Mot. for Summ. J., Dkt. No. 56-1.) To that end, Plaintiff deposed two current Facebook employees—Nicolle Hickman and Ginger Melrose—in October 2018. Facebook deposed Bigger immediately thereafter. As far as the Court

can tell, those three are the only depositions that have taken place to date. More importantly, they are the only depositions that are presently on the record before the Court.

Plaintiff filed her Motion for Conditional Certification on November 8, 2018. On November 15, 2018, Facebook filed its Motion for Summary Judgment, apparently to Plaintiff's great consternation, as Facebook had not informed her that it was planning to file such a motion. (*See* Becvar Decl.) Of course, Facebook was under no obligation to keep Plaintiff abreast of its case strategy.

Plaintiff argues that Facebook's summary judgment motion is premature because discovery is not complete in this case. But procedurally, the motion is timely. The federal rules do not require that discovery always be complete (or even underway) before summary judgment can be granted. *Larsen v. Elk Grove Vill., Ill.*, 433 F. App'x 470, 472 (7th Cir. 2011). FED. R. CIV. P. 56(b) allows a party to file a motion for summary judgment "at any time" until 30 days after the close of discovery, unless the court orders otherwise. FED. R. CIV. P. 56(b). Because discovery has not closed, and the Court has not issued any restrictions on when parties may file for summary judgment, Facebook's Motion is properly before the Court.

- 6 -

In Plaintiff's response to Facebook's Motion for Summary Judgment, she invokes Rule 56(d), arguing that the Court must deny or continue Facebook's summary judgment motion in order for Plaintiff to conduct further discovery before responding. Under Rule 56(d), if a nonmovant shows by affidavit or declaration that, for specified reasons, she cannot present facts essential to justify her opposition, a court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. FED. R. CIV. P. 56(d). Plaintiff attached a declaration by her counsel to her summary judgment response. (*See* Becvar Decl.) The declaration sets forth the various documents that Facebook has yet to produce, which Plaintiff's counsel believes will raise a genuine issue of material fact as to Facebook's exemption defenses. (Becvar Decl. ¶ 7.) Plaintiff's counsel also names individuals that Plaintiff has yet to depose who she believes could also raise a genuine issue of material fact. (Becvar Decl. ¶ 8.)

Facebook argues that Plaintiff's Rule 56(d) argument is unavailing because she has, to this day, not made any motion under that rule. The Seventh Circuit has made clear that Rule 56(d) requires a motion. *See Deere & Co. v. Ohio Gear*, 462 F.3d 701, 706 (7th Cir. 2006) ("When a party thinks it needs additional discovery

in order to oppose a motion for summary judgment … Rule 56(f) [now Rule 56(d)] provides a simple procedure for requesting relief: move for a continuance and submit an affidavit explaining why the additional discovery is necessary."); *Farmer v. Brennan*, 81 F.3d 1444, 1449 (7th Cir. 1996) ("When a party is unable to gather the materials required by Rule 56(e), the proper course is to move for a continuance under Rule 56(f) [now Rule 56(d)]."). A Rule 56(d) motion "must state the reasons why the party cannot adequately respond to the summary judgment motion without further discovery and must support those reasons by affidavit." *Ohio Gear*, 462 F.3d at 706. The preceding opinions refer to an earlier version of Rule 56, in which the current 56(d) provision was located in 56(f). Because no substantive change to this provision occurred when the rest of Rule 56 was rewritten, cases applying Rule 56(f) remain controlling authority. *See* 10B Fed. Prac. & Proc. Civ. § 2741 (4th ed.).

Plaintiff has not made any motion under Rule 56(d), which constitutes procedural error. *See Spierer v. Rossman*, No. 1:13-CV-00991, 2014 WL 4908023, at *7 (S.D. Ind. Sept. 30, 2014) (finding that plaintiffs committed procedural error by filing a Rule 56(d) affidavit contemporaneously with their response to summary judgment, rather than requesting 56(d) relief *instead* of responding to the summary judgment motion), *aff'd,* 798 F.3d 502

(7th Cir. 2015). Thus, Plaintiff's Rule 56(d) arguments and declaration are not properly before the Court and will be disregarded. The Court will judge Facebook's summary judgment motion on the record as it stands.

### B. Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party satisfies its burden, the non-movant must present facts to show a genuine dispute exists to avoid summary judgment, which requires that she "do more than simply show that there is some metaphysical doubt as to the material facts." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004). When evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

### C. FLSA

Under the FLSA, employers must pay their workers overtime wages for each hour worked in excess of 40 hours per week. 29 U.S.C. § 207. Overtime wages constitute payment of at least one and half times the regular rate of pay. *Id*. There are exceptions to the overtime wage requirement, and the burden is on the employer to establish that an employee is covered by an exemption. *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 571 (7th Cir. 2012). However, the Supreme Court recently rejected the oft-cited proposition that exemptions to the FLSA are construed narrowly against the employers seeking to assert them. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). It held that FLSA exemptions should be given a "fair," rather than narrow, interpretation. *Id*. Additionally, the evaluation of an FLSA claim requires a "thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Blanchar v. Standard Ins. Co.*, 736 F.3d 753, 756 (7th Cir. 2013) (citation omitted).

Facebook claims that two FLSA exceptions are applicable to Bigger's work as a CSM: (1) the "highly compensated employee" exception, and (2) the "bona fide administrative capacity" exception. The Court will discuss each in turn. And because both Plaintiff and Defendant's Local Rule 56.1 statements of undisputed material facts contain almost exclusively disputed

characterizations about the nature of Bigger's work, the Court will directly cite to the relevant depositions when necessary.

### 1. **Highly Compensated Employee Exception**

Facebook claims that Bigger was overtime-exempt under the "highly compensated employee" exception to the FLSA. Under this exception, a "high level of compensation is a strong indicator of an employee's exempt status." 29 C.F.R. § 541.601. An employee who receives a total annual compensation of at least $100,000 is exempt from overtime if she "customarily and regularly perform[ed] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." *Id*. Facebook claims that Bigger customarily and regularly performed the exempt duties of an "administrative" employee. Bigger was paid over $100,000 annually throughout her time at Facebook. (SOF ¶ 18.) Thus, Facebook need only demonstrate that Bigger regularly performed one of the two types of duties of an administrative employee: (1) performing work related to Facebook's management or general business operations; or (2) exercising discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200; *Silver v. Townstone Fin., Inc.*, No. 14-CV-1938, 2016 WL 4179095, at *4 (N.D. Ill. Aug. 8, 2016).

An employee satisfies the first category of exempt administrative duties — work related to the employer's management

or general business operations — when she regularly performs work "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The distinction between assisting with running the business and working on a production line or selling a product is referred to as the "production versus staff" dichotomy. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 FR 22122-01 (Apr. 23, 2004); *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 n.22 (7th Cir. 2012). While the production versus staff dichotomy can be difficult to apply in modern service and information industries, *id.*, it is one analytical tool courts can use to determine whether work is directly related to management policies or general business operations. *Schaefer*, 679 F.3d at 574 n.22. Additionally, FLSA regulations provide an illustrative list of "functional areas" in which employees frequently qualify for the administrative exemption, which includes advertising and marketing. 29 C.F.R. § 541.201(b). Facebook contends that Bigger regularly performed several types of work related to Facebook's management or general business operations: (1) promoting sales, (2) marketing, and (3) consulting.

### a. Administrative Duties: Promoting Sales

Facebook first argues that Bigger regularly "promoted sales," which the Seventh Circuit has indicated is an administrative duty. *See Schaefer*, 679 F.3d at 574, 577. In *Schaefer-LaRose v. Eli Lily & Co.*, 679 F.3d 560 (7th Cir. 2012), the Seventh Circuit concluded that pharmaceutical sales representatives fall within the administrative exemption to the overtime requirements of the FLSA. *Id.* at 562. The court found that pharmaceutical sales representatives' work is directly related to the general business operations of their company because they "neither produce the employers' products nor generate specific sales, but service the production and sales aspects of the business by communicating the employers' message to physicians." *Id.* at 576-77. *Schaefer* differs from this case in a key respect. Critical to the *Schaefer* court's holding was the fact that, due to strict federal law and medical ethics requirements, pharmaceutical sales representatives do not actually *sell* any pharmaceuticals to physicians, nor do the physicians upon whom they call actually *buy* any pharmaceuticals. *Id.* at 562-63, 575 n. 23 (noting that the sales reps "do not make individual sales" and the "circumstances of pharmaceutical work [are] somewhat unusual, as far as sales and marketing go").

Plaintiff argues that rather than "promoting sales," she made sales, which is not an administrative employee's task. She cites

- 13 -

*Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010), in which the Second Circuit considered the FLSA overtime lawsuit of a plaintiff who worked as an advertising salesperson for a free magazine. *Reiseck*, 591 F.3d at 103. That court concluded that an employee making sales to individual customers is a salesperson — not an administrative employee — for purposes of the FLSA. *Id.* at 107. In reconciling the differences between *Schaefer* and *Reiseck*, the Seventh Circuit emphasized that the *Reiseck* plaintiff was involved in "routine individual sales," unlike the *Schaefer* plaintiffs. *Schaefer*, 679 F.3d at 575 n.23.

Plaintiff contends that her work at Facebook was more comparable to the *Reiseck* plaintiff than the *Schaefer* plaintiffs. Facebook's business model is similar to the free magazine at issue in *Reiseck*. Facebook provides its social media platforms to users on a complimentary basis, and advertising sales constitute the majority of its revenue. *See Reiseck*, 591 F.3d at 103. The Seventh Circuit's analysis of *Reiseck* suggests that if Facebook's advertising constitutes its "product," and Bigger sold that "product," she would be a salesperson for FLSA purposes. *See Schaefer*, 679 F.3d at 575 n.23. Furthermore, Plaintiff underscores that "when an employee is engaged in the core function of a business, his or her task is not properly categorized as administrative." *Id.* at 574 (finding that plaintiffs' work

*supports* the pharmaceutical company's core function but is distinct from it). Therefore, if advertisements are the core function of Facebook's business (as they appear to be from the record), and Bigger sold those ads, she was engaged in the core function of Facebook's business. *Id.*

The material facts as to whether Bigger made sales or "promoted" sales are in dispute. Facebook admits that its business is the sale of advertising. (SOAF ¶ 1.) Nicolle Hickman ("Hickman"), Facebook's Federal Rule of Civil Procedure 30(b)(6) designated deponent, is an "HR programs lead" for Facebook's sales and marketing division. (Hickman Dep. 14:7-21.) Hickman testified that Facebook is an "advertising business" and "the product [it] sell[s] is advertising." (*Id.* at 18:1-9.) Hickman further testified that, prior to the reorganization of its sales team structure in 2013, Facebook used to have two separate sales divisions: "direct sales" and "mid market sales." (*Id.* at 42:19-25; 45:9-23.) Bigger worked in a client-facing sales division. (*Id.* at 17:23-18:13.) Hickman testified that CSMs have "sales quotas," and cannot determine the pricing for Facebook products. (*Id.* at 54:12-20; 55:7-8.)

Facebook's summary judgment briefing is replete with corporate jargon that attempts to obscure the issue of whether Bigger made sales. (*See* Def.'s Mot. for Summ. J. at 4, Dkt. No. 49

(stating that the purpose of Bigger's job was "promoting the sale of Facebook's panoply of digital marketing product offerings to advertisers").) But ultimately, Facebook admits that Bigger's responsibilities included making sales. (*See* SOAF § 3; Hickman Dep. at 88:11-20.) Hickman testified further that CSMs are "responsible for sales with existing clients… [CSMs and Client Partners are] actually both sales which is why they're on commission plans." (Hickman Dep. 88:6-10.) Ultimately, the *Schaefer* opinion was specific to "the particular jobs at issue here in this particular industry," *id*. at 575 n.23, and the undisputed facts are insufficient to show that Bigger's work at Facebook is similar enough to that of the pharmaceutical sales reps in *Schaefer*. Thus, a triable issue of fact remains regarding Defendant's "promoting sales" theory.

### b. Administrative Duties: Marketing

Facebook also argues that Bigger regularly performed marketing and consulting work, which generally constitute exempt administrative duties. 29 C.F.R. § 541.201(b). Bigger disputes this characterization. (SOAF ¶ 2.) Bigger claims that, rather than performing marketing and consulting tasks, she performed more rote "operational tasks" like data entry (SOAF ¶ 7); billing clients (SOAF ¶ 6); coordinating client meetings, parties, and meals (SOAF

- 16 -

¶ 15); and ordering and delivering "swag" (Facebook branded merchandise) (*id*.).

First, the Court finds that a genuine issue of material fact exists as to whether Bigger did marketing work. Neither the FLSA regulations nor the parties define "marketing." Facebook only identifies one specific marketing duty that Bigger had: she "develop[ed] marketing plans" for Facebook's clients by engaging "cross functional partners" within Facebook and doing some of her own "internal digging and sleuthing to find material." (Def.'s Mot. for Summ. J. at 5 (citing SOF ¶¶ 38-39)). Bigger counters that she did not "develop marketing plans," but merely pulled advertising templates from Facebook's internal repositories to show to clients. (SOF ¶ 39.) Additionally, Hickman testified that the sales group Bigger worked in was distinct from Facebook's separate Business Marketing Group. (Hickman Dep. 18:14-19:15.) And in its Motion for Summary Judgment, Facebook characterized one of Bigger's duties as "liais[ing]" between clients and Facebook's "marketing sciences team." (Def.'s Mot. for Summ. J. at 9.) Thus, Facebook's own submissions suggest that Facebook's marketing work took place in a different department, of which Bigger was not a part. As such, a factual dispute exists about whether Bigger did marketing work. Facebook's argument fails.

### c. Administrative Duties: Consulting

Facebook next argues that Bigger had a "multi-faceted advisory/consultative role" at Facebook. (Def.'s Mot. for Summ. J. at 13.) FLSA regulations provide that acting as an adviser or consultant to an employer's clients may constitute administrative duties. 9 C.F.R. § 541.201(c). Facebook adopts Miriam-Webster's definition of consultant—providing professional or expert advice — and asserts that Bigger was a consultant because "she gave clients advice and recommendations about their advertising spend on Facebook." (Def.'s Mot. for Summ. J. at 13.) Facebook also cites to *Verkuilen v. MediaBank, LLC*, 646 F.3d 979 (7th Cir. 2011), which concerned an account manager at a software company. In that case, the plaintiff did not make individual sales; she was responsible for working with the company's software engineers to determine how software could be adapted to customer's specific needs. *Verkuilen*, 646 F.3d at 982. The court found the plaintiff was a "specialist" and had a "consulting role," and was exempt from overtime under the administrative exception. *Id.* at 982-83. *Verkuilen* is instructive in considering whether an FLSA plaintiff does "consultant" work, but as explained below, the relevant facts for this determination are in dispute.

Facebook's "consultant" argument is largely duplicative of its "promoting sales" claim. (*See* Def.'s Mot. for Summ. J. at 13

(stating that Bigger's primary duty was to "promote the sale of Facebook's suite of advertising products through consultation with its clients.").) The facts that Facebook points to in support of its consultant argument all describe the same essential pattern: to the extent Bigger was "advising" or "consulting" clients, such activities were in furtherance of her role selling, or upselling, Facebook "products" (ads). (SOF ¶¶ 26, 28, 31, 43, 50-52, 61.) The facts do not suggest that Bigger was consulting on advertising campaigns—Facebook's clients had their own advertising agencies. (SOF § 41.) And the "expertise" Facebook claims Bigger had was knowing the scope of Facebook's advertising offerings and matching those products to the clients' needs. (SOF ¶ 27.). This argument is unavailing. If being familiar with the employer's clients' needs and the employer's product list makes one a consultant, every employee who made sales would be a consultant. As the Court has already explained, whether Bigger was making sales or merely promoting them is in dispute. Because Facebook argues that Bigger's "consulting" work was intertwined with promoting sales, its claim is premised on disputed material facts, and fails.

### d. Administrative Duties: Exercising Discretion

Facebook next contends that Bigger regularly performed work in the second category of administrative duties: "exercis[ing] discretion and independent judgment with respect to matters of

significance." 29 C.F.R. § 541.200. Discretion and independent judgment implies that the employee "has authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c); *Blanchar v. Standard Ins. Co.,* 736 F.3d 753, 757 (7th Cir. 2013). However, this prong does not require that the employee's decisions "have a finality that goes with unlimited authority and a complete absence of review." *Id.*; *Blanchar*, 736 F.3d at 758. Facebook argues that Bigger performed many tasks that satisfy this standard, which can be distilled to: (1) making recommendations to clients about how best to allocate their advertising dollars, (2) deciding what information to relay between clients and other internal Facebook employees, and (3) creating finished products that were presented to clients.

Bigger disputes Facebook's characterization of her work and argues that to the extent she made recommendations to clients, she merely presented materials that she pulled from Facebook's repositories of examples of advertising products. (*See* Bigger Dep. 123:9-20 ("I was not coming up with the solutions. I was not creating the solutions. It was all things that had been provided to us by vertical managers, product managers, industry experts, engineers, measurement teams."); 126:11-19 ("many of the tasks… were already written down, and we had manuals and we had scripts and we had templates to follow").) Further, Bigger emphasizes

that she did not have authority to make independent choices, as all strategic decisions were made "at the team level," and Bigger's supervisor required her to get his approval at all phases of a task. (SOAF §§ 25, 26.) Facebook admits that Bigger did not have the ability to change or create advertising products or solve complex business issues. (SOAF § 19.) However, at one point in her deposition, Bigger stated that she produced client-ready reports "to some degree." (Bigger Dep. 321:8-10.) Thus, it appears that Bigger's work involved some amount of discretion; however, it is unclear whether she exercised that discretion "customarily and regularly" (defined by FLSA regulations as work normally and recurrently performed every workweek, not isolated or one-time tasks, 29 C.F.R. § 541.701) and about matters of significance. Construing the record in the light most favorable to the Bigger, the facts are not sufficiently clear to find that Bigger had the requisite discretion as a matter of law. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Defendant cites the Seventh Circuit's decision in *Blanchar v. Standard Insurance Company*, 736 F.3d 753 (7th Cir. 2013), to support its contention that Bigger had discretion on matters of significance. The court held in *Blanchar* that the "Director of Sales/Product Manager" for an insurance company was an administrative employee and thus exempt from the FLSA's overtime

provisions. *Blanchar,* 736 F.3d at 759. The *Blanchar* plaintiff did not make sales; rather, he "promoted sales" as did the *Schaefer* plaintiffs. *Id.* at 757. The court found the following duties constituted discretion: promoting sales; training and advising the sales staff; scripting talking points for consultants to use; working largely alone, and meeting with his supervisor only once a year; and using materials he made himself in presentations. *Id.* at 758. The case Defendant cites is factually inapposite.

In reaching its decision, the *Blanchar* court also considered the FLSA regulations, which list factors for courts to consider when determining whether an employee exercised discretion with respect to matters of significance. *Id.* at 757 (citing 29 C.F.R. § 541.202(b)). Factors include whether the employee provides consultation or expert advice to management; whether the employee has authority to formulate, interpret, or implement management policies or operating practices; and whether the employee has authority to waive or deviate from established policies and procedures without prior approval). Facebook does not contend that Bigger's work satisfies any of the § 541.202(b) factors. Additionally, the *Blanchar* court looked to the Department of Labor's 2004 final rule and found that courts can also consider factors set forth therein when assessing discretion. *Id.* at 758 (citing Defining and Delimiting the Exemptions for Executive,

Administrative, Professional, Outside Sales and Computer Employees, 69 FR 22122-01 (Apr. 23, 2004)). Those factors include the employee's personnel responsibilities; advertising or promotion work; freedom from direct supervision; authority to set budgets; duty to anticipate competitive products or services and distinguish them from competitor's products or services; and duty to troubleshoot or problem-solve on behalf of management. 69 FR 22122-01. Some of these factors may cut in Bigger's favor, and some against. Regardless, Facebook failed to measure Bigger's work against those factors. Thus, under *Blanchar,* there remains a genuine dispute of material facts as to Bigger's discretion.

Accordingly, Facebook fails to establish that Plaintiff is overtime exempt under the highly compensated employee test.

### 2. Bona Fide Administrative Capacity Exception

As an alternative to the highly paid employee test, Defendant seeks to establish that Bigger is exempt from the FLSA's overtime requirements because she was employed in a "bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). To prove that this exemption applies, Facebook must establish: (1) Bigger was compensated at least $455 per week on a salary basis; (2) her primary duty entailed office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; *and* (3) her primary duty included the

exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. The Court need not perform this inquiry now. Defendant failed to establish that Bigger regularly performed *either* of those two duties as a matter of law. Thus, the Court denies Facebook's Motion for Summary Judgment on Bigger's FLSA claims.

## B. IMWL

The Illinois Minimum Wage Law provides the same overtime wage protections to hourly workers as the FLSA. *See* 820 ILCS § 105/4a. As a result of their common purpose and similar language, the two statutes generally require the same analysis. *See Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 798 (N.D. Ill. 2013) (citing *Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3, 605 (7th Cir. 1993)). However, the IMWL applies the administrative exemption "as defined by or covered by the [FLSA] and the rules adopted under that Act, *as both exist on March 30, 2003*." 820 ILCS § 105/4a (emphasis added). Thus, for Facebook to prevail on summary judgment of the IMWL claim, it must establish that Plaintiff is overtime exempt under the FLSA exemptions that existed as of March 30, 2003. *Zelenika v. Commonwealth Edison Co.*, No. 09 C 2946, 2012 WL 3005375, at *14 (N.D. Ill. July 23, 2012).

As the Seventh Circuit explained in *Kennedy v. Commonwealth Edison Company*, 410 F.3d 365 (7th Cir. 2005), the old FLSA

regulations had a "long test" and a "short test" to determine whether an employee fell within the administrative exception. *Kennedy*, 410 F.3d at 370. The short test, which applies to high salaried employees, would apply to Bigger. *See id.*; 29 C.F.R. § 541.214 (2003). The short test is similar to FLSA's current bonda fide administrative capacity test, but it is not identical. For example, the short test does not specify that an employee had to exercise discretion "with respect to matters of significance," as the current test does. 29 C.F.R. § 541.200. Regulations interpreting the short test explained that "the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence." *Zelenika*, 2012 WL 3005375, at *15; 29 C.F.R. § 541.207(d)(1) (2003). The old regulations further distinguished between the exercise of such discretion and "the use of skill in applying techniques, procedures, or specific standards." *Id*. Of potentially particular relevance to Bigger, the old regulations explained that "[a]n employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow . . . is not exercising discretion and independent judgment within the meaning of § 541.2." *See* 29 C.F.R. § 541.207(c)(1) (2003); *Zelenika*, 2012 WL 3005375, at *15.

Defendant did not address the relevant IMWL standards in its motion, but instead assumed that the short test is identical to the bona fide administrative capacity exception in the current regulations. Even if the Court assumes these two tests are coextensive, Facebook failed to establish as a matter of law that Plaintiff was a bona fide administrative employee under the FLSA. Therefore, Facebook's Motion for Summary Judgment on the IMWL claim fails.

### III.   FLSA CONDITIONAL CERTIFICATION

#### A.   Legal Standard

The FLSA authorizes employees to bring a "collective action" against an employer for violations of the FLSA's overtime provisions, on behalf of themselves and other employees "similarly situated." 29 U.S.C. § 216(b). FLSA lawsuits do not proceed as traditional Rule 23 class actions. Instead, they proceed as "opt-in representative actions," or collective actions. *Schaefer v. Walker Bros. Enters.*, 829 F.3d 551, 553 (7th Cir. 2016); 29 U.S.C. § 216(b). A prospective member of the collective action may "opt-in" by filing a written consent form in the court where the action is brought; a person who does not opt-in is not part of the FLSA collective action and is not bound by the court's decision. *Garcia v. Salamanca Grp., Ltd.*, No. 07 C 4665, 2008 WL 818532, at *2 (N.D. Ill. Mar. 24, 2008). A district court has wide discretion to manage

collective actions. *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010) (citation omitted).

The Seventh Circuit has not articulated a procedure for determining whether an FLSA lawsuit should proceed as a collective action. Nor has it set forth criteria for determining whether employees are "similarly situated." *Pfefferkorn v. PrimeSource Health Grp., LLC*, No. 17-CV-1223, 2019 WL 354968, at *2 (N.D. Ill. Jan. 29, 2019). Courts in this District, however, have used a two-step process. *Id*. The first step is "conditional certification," in which a plaintiff must make a "modest factual showing" that she and similarly situated employees were "victims of a common policy" that violated the FLSA. *Id*. At this step, Plaintiff needs only to clear a "low bar" to meet her burden. *Id*. (citation omitted); *Howard v. Securitas Security Services, USA Inc.*, No. 08 C 2746, 2009 WL 140126, at *5 (N.D. Ill. Jan. 20, 2009) ("[T]he court looks for no more than a 'minimal showing' of similarity."); *Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010) (finding that the similarly situated standard is a liberal one, which "typically results in conditional certification" of a collective) (citation omitted).

After the parties complete discovery, the court conducts the second, more stringent step of the inquiry. *Id.* at 990. At that point the court knows which employees will be part of the class

- 27 -

and it must "reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis." *Id.* (citation omitted). The second step imposes more demanding requirements on plaintiffs, *id.*, but is not yet relevant at this stage.

## B. Discussion

Plaintiff seeks conditional certification of the following collective:

> All individuals who were employed by Facebook as Client Solutions Managers at level IC-3 or IC-4 at any location in the United States during the period from three years prior to the entry of the conditional certification order, and as extended by stipulation of the parties, to the present.

The parties have entered into two independent tolling agreements, which extend the limitations period for the claims of prospective collective members an additional 111 days. (*See* Tolling Agreements, Dkt. No. 22, 34.)

### 1. Scope of Collective

Facebook contends that the scope of Plaintiff's proposed collective must be narrowed to exclude all individuals who had arbitration clauses and class action waivers in their employment contracts. By Facebook's estimate, at least 252 of the CSMs who Plaintiff seeks to include in her collective — over half the potential collective — executed arbitration agreements and class

- 28 -

action waivers with Facebook. (Hickman Declaration, Ex. 1 to Def.'s Resp. to Pl.'s Mot. for Cond. Cert., Dkt. No. 54-1.) Therein, Facebook alleges, the CSMs agreed to arbitrate individually all claims for "non-payment, incorrect payment, or overpayment of wages . . . whether such claims be pursuant to . . . any federal, state, or municipal laws concerning wages . . . failure to pay wages . . . and/or any other claims involving employee compensation issues." (Arbitration Agreements, Ex. A, B to Ex. 1 to Def.'s Resp. to Pl.'s Mot. for Cond. Cert.) The Supreme Court has held that district courts have discretion to implement 29 U.S.C. § 216(b) collective actions by facilitating notice to "potential plaintiffs." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169-71 (1989). Facebook argues that because many of the individuals in Bigger's putative collective are barred from litigating the claims at issue in her case, they are not "potential plaintiffs" and should not be sent notice.

There is inherent conflict between the "liberal federal policy favoring arbitration agreements," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (citation omitted), and the "modest factual showing" that a plaintiff must make to obtain conditional certification under the FLSA, *Pfefferkorn v. PrimeSource Health Grp., LLC*, No. 17-CV-1223, 2019 WL 354968, at *2 (N.D. Ill. Jan. 29, 2019) (describing the "similarly situated" burden as a

"low bar" at step one). Courts must "rigorously" enforce arbitration agreements according to their terms. *Epic Sys. Corp.*, 138 S. Ct. at 1621. And the Federal Arbitration Act ("FAA") provides that an arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Federal district courts are divided over whether notice of a collective action may be sent to employees with arbitration agreements, and only one appellate court has weighed in on the issue thus far. *See In re JPMorgan Chase & Co.*, 916 F.3d 494, 499 n.6 (5th Cir. 2019) (collecting cases and laying out the various approaches district courts have taken on this matter). The Fifth Circuit recently held that district courts cannot send notice to an employee with a valid arbitration agreement unless the record shows that nothing in the agreement would prohibit that employee from participating in the collective action. *Id*. at 501. Facebook urges the Court to follow the Fifth Circuit's decision. There are several countervailing considerations, however, that lead the Court to hold otherwise.

First, Facebook has not moved the Court to compel arbitration, and it cannot do so presently. This is because Bigger, the only plaintiff in this case, did not sign an arbitration agreement. Whether parties have agreed to submit a particular dispute to

arbitration is typically an issue for judicial determination. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). In *Zurich American Insurance Company v. Watts Industries*, 466 F.3d 577, 580 (7th Cir. 2006), the Seventh Circuit held that a party moving to compel arbitration must show that: (1) a written agreement to arbitrate exists; (2) the dispute at issue is within the scope of that agreement; and (3) the other party has refused to arbitrate. In its response to Bigger's motion for conditional certification, Facebook asserts that these elements have been met, and its arbitration agreements are enforceable.

The contracts Facebook urges the Court to enforce are between Facebook and third parties not before the Court. Federal courts cannot issue advisory opinions. *Golden v. Zwickler*, 394 U.S. 103, 108 (1969). Thus, Facebook's argument is premature at this stage. *See Weckesser v. Knight Enterprises S.E., LLC*, No. 2:16-CV-02053, 2018 WL 4087931, at *3 (D.S.C. Aug. 27, 2018) ("The potential opt-in plaintiffs allegedly subject to arbitration agreements have not yet joined this action, and the Court therefore has no ability to determine whether any potential arbitration agreement are enforceable against them.").

Second, the enforceability of arbitration contracts must be adjudicated on the merits, and the Court "does not make merits determinations" at the conditional certification stage. *Briggs v.*

*PNC Fin. Servs. Grp., Inc.*, No. 15-CV-10447, 2016 WL 1043429, at
*2 (N.D. Ill. Mar. 16, 2016) (citing *Bergman v. Kindred Healthcare,
Inc.*, 949 F. Supp. 2d 852, 855–56 (N.D. Ill. 2013)). Courts have
certified collective actions and sent notice to employees who
signed arbitration agreements, based on the proposition that the
agreements might be unenforceable. *See Romero v. La Revise Assocs.,
L.L.C.*, 968 F. Supp. 2d 639, 647 (S.D.N.Y. 2013) ("[D]efendants'
proposal essentially amounts to an invitation for the Court to
adjudicate the validity of the arbitration agreements. But . . .
this sort of merits-based determination should not take place at
the first stage of the conditional collective action approval
process."); *Hanson v. Gamin Cargo Control, Inc.*, No. 4:13-CV-0027,
2013 WL 12107666, at *2 (S.D. Tex. Aug. 9, 2013) (authorizing
notice because "plaintiffs do not know who is and who is not
subject to [an arbitration] agreement, and have not conceded that
valid and legal arbitration agreements cover the dispute at hand").

Furthermore, whether parties have an enforceable arbitration
agreement, and whether that agreement covers the dispute at issue,
is determined by state law principles of contract formation.
*Zurich*, 466 F.3d at 580. The parties have not briefed which state
law they believe applies to the arbitration agreements. And
Facebook admits that there are two different arbitration
agreements that could apply to the potential opt-in plaintiffs

(Exs. A, B to Ex. 1 to Def.'s Resp. to Pl.'s Mot. for Cond. Cert.), though the Court does not know whether opt-in plaintiffs will ultimately bring in neither, one, or both of the agreements. Thus, the Court has insufficient information before it to judge the validity of the arbitration agreements.

The Court will determine whether to exclude CSMs who signed arbitration agreements at the conclusion of discovery, when it can properly analyze the validity of any arbitration agreements to which the opt-in plaintiffs may be party. *See Ali v. Sugarland Petroleum*, 2009 WL 5173508, at *4 (S.D. Tex. Dec. 22, 2009). At that time, Facebook may move to decertify the case or divide the class into subclasses. *Nehmelman v. Penn Nat. Gaming, Inc.*, 822 F. Supp. 2d 745, 751 (N.D. Ill. 2011). Nothing in this Opinion should be construed as affecting Facebook's ability to seek dismissal, prior to the second stage of the two-part inquiry, of the claims of any plaintiffs with valid arbitration agreements who join the action.

Defendant next argues that Bigger's putative collective must be narrowed to exclude all CSMs who made less than $100,000 annually, as those CSMs are not sufficiently similarly situated to Bigger. Defendant's argument is premised on the fact that Bigger will be subject to the FLSA's highly compensated employee exemption, and the Court cannot use that test on CSMs who made

under $100,000. *See* 29 C.F.R. § 541.601(c). However, "the applicability of FLSA exemptions typically is not addressed during step one of the certification analysis." *Slaughter v. Caidan Mgmt. Co., LLC*, 317 F. Supp. 3d 981, 990 (N.D. Ill. 2018). And Plaintiffs can be similarly situated for purposes of the FLSA even when "there are distinctions in their job titles, functions, or pay." *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 849 (N.D. Ill. 2008). This argument fails.

Plaintiff has made a "modest factual showing" that she and similarly situated employees were victims of a common policy that violated the FLSA. *Pfefferkorn*, 2019 WL 354968, at *2. Accordingly, the Court proceeds to Plaintiff's Proposed Notice to the FLSA putative collective members. (*See* Proposed Notice, Ex. A to Pl.'s Mot. for Cond. Cert., Dkt. No. 45-1.)

### 2. Form of Notice

Facebook argues that several of Plaintiff's requests regarding notice to the proposed collective are inappropriate. First, Defendant contends that Plaintiff's Proposed Notice should inform potential opt-in plaintiffs if there are circumstances in which they may have to bear costs or pay fees to Plaintiff's counsel. However, Plaintiff's counsel has assured the Court that there are "no circumstances" in which opt-in plaintiffs would need to bear costs or pay fees to Plaintiff's counsel. (Pl.'s Reply to

Mot. for Cond. Cert., Dkt. No. 55.) The Court denies this requested revision.

Second, Defendant claims that sending the Proposed Notice via email, per Bigger's request, would be intrusive and unwarranted. However, this Court agrees with the many other courts that have concluded that because communication by email is "the norm," notice by email is appropriate. *See Grosscup v. KPW Mgmt., Inc.*, 261 F. Supp. 3d 867, 880 (N.D. Ill. 2017) (collecting cases); *Atkinson v. TeleTech Holdings, Inc.*, No. 3:14-cv-253, 2015 WL 853234, *5 (S.D. Ohio Feb. 26, 2015) (noting that notice via both U.S. mail and e-mail to all potential opt-in plaintiffs in an FLSA action "appears to be in line with the current nationwide trend"). Particularly in this case, where the opt-in plaintiffs all work or have worked for a digital media company, using email enhances the chance that they receive notice. Plaintiff is authorized to send the Proposed Notice via email.

Third, Plaintiff requests to send a reminder notice 20 days before the end of the opt-in period to any opt-in plaintiffs who have not returned their opt-in consent forms. Defendant believes this request should be denied, arguing that a reminder notice is both unnecessary and unfair to Facebook, as it may be interpreted as the Court encouraging putative collective members to join this action. The Court agrees. A reminder is unnecessary given the

adequacy of both U.S. mail and email notice and may be misinterpreted as judicial encouragement to join the lawsuit. *See Witteman v. Wisconsin Bell, Inc.*, No. 09-CV-440, 2010 WL 446033, at *3 (W.D. Wis. Feb. 2, 2010) ("The purpose of notice is simply to inform potential class members of their rights. Once they receive that information, it is their responsibility to act as they see fit."). The Court denies Plaintiff's request for a reminder notice.

Fourth, Defendant asks the Court to deny Plaintiff's request to post the Proposed Notice in all Facebook offices where members of the FLSA Collective are likely to view it. Defendant argues that mailed notice is adequate and posting notice in its place of business is too intrusive. Workplace postings can be overly intrusive, especially when a workplace posting is meant to supplement a mailed notice. *See Howard v. Securitas Sec. Servs., USA Inc.*, No. 08 C 2746, 2009 WL 140126, at *9 (N.D. Ill. Jan. 20, 2009); *Lane v. Atlas Roofing Corp.*, No. 4:11-CV-04066, 2012 WL 2862462, at *3 (C.D. Ill. July 11, 2012). To justify this sort of duplicative notification, there must be some showing that notice via both U.S. mail and email is insufficient to provide prospective members with accurate and timely notice of their potential right to join the lawsuit. *Id.* Plaintiff has made no such showing. The

Court therefore denies her request to post the Proposed Notice in Defendant's workplace.

Subject to the modifications noted above, Plaintiff's Proposed Notice meets the requirements of "timeliness, accuracy and information." *Hoffmann-La Roche*, 493 U.S. at 172. The Court approves it.

## IV.   CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (Dkt. No. 48) is denied. Plaintiff's Motion for Conditional Certification of an FLSA collective action (Dkt. No. 45) is granted in part and denied in part as follows:

1.   The Court conditionally certifies a collective action by Plaintiffs and similarly situated members of the collective pursuant to 29 U.S.C. § 216(b), defined as:

> All individuals who were employed by Facebook as Client Solutions Managers at level IC-3 or IC-4 at any location in the United States during the period from three years prior to the entry of this Order, and as extended by stipulation of the parties, to the present.

2.   The Court orders Facebook to produce to Plaintiff in a usable electronic format the names, last-known mailing address, email address, telephone number, dates of employment, social security numbers, and dates of birth of all FLSA Collective members to be notified. Facebook shall tender this information to Plaintiff on or before April 2, 2019.

3.    The Court orders notice to the FLSA Collective in the form of her Proposed Notice. The opt-in period will be 60 days from the Notice mailing.

4.    The Court authorizes Plaintiff to send the Proposed Notice, at her expense, by first-class U.S. Mail and email to all members of the FLSA Collective to inform them of their right to opt-in to this lawsuit.

5.    The Court denies Plaintiff's request for a reminder notice 20 days before the conclusion of the opt-in period.

6.    The Court denies Plaintiff's request to post the Proposed Notice in Facebook's offices.

**IT IS SO ORDERED.**

_____
    Harry D. Leinenweber, Judge
    United States District Court

Dated: 3/22/2019

- 38 -